**Juan SORIA, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 69,679.**

Court of Criminal Appeals of Texas.

Sept. 11, 1996.

Rehearing Denied Nov. 6, 1996.

John C. Beatty, Allan K. Butcher, Fort Worth, for appellant.

David M. Curl , David K. Chapman, Assistant District Attorneys, Fort Worth, Matthew Paul, State's Attorney, Austin, for appellee.

### OPINION ON STATE'S MOTION FOR REHEARING

MALONEY, Judge.

Appellant was convicted of capital murder, the jury answered the special issues in the affirmative and the trial court assessed the death penalty. On original submission we affirmed appellant's conviction but reformed his sentence to life imprisonment based upon our holding that the evidence was insufficient to support an affirmative finding to the second special issue. *Soria v. State*, No. 69,679 slip op. at 6 (Tex.Crim.App. June 8, 1994)(op. on original submission)(per curiam)(unpublished). The State filed a motion for rehearing, contending the evidence was legally sufficient to support the finding on the second special issue. We granted the State's motion to reconsider this issue. The State's motion for rehearing is sustained.

### I.

The State's primary contention on rehearing is that we failed to view the evidence in a light most favorable to the verdict as required by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and its progeny. The State points to evidence that appears to have been considered by the Court but was *not* favorable to the verdict and to evidence that was not mentioned in the opinion but *was* favorable to the verdict.

At this point, we pause to revisit the applicable standard to be applied by a reviewing court in assessing legal sufficiency of the evidence. We have long applied the standard set forth in *Jackson*, supra, when assessing claims that the evidence is insufficient to support the verdict. We recently reiterated our limited role under *Jackson*:

[A]s an appellate court, our task is to consider all of the record evidence and reasonable inferences therefrom in the light most favorable to the jury's verdict and to determine whether, based on that evidence and those inferences, a rational jury could have found beyond a reasonable doubt [the elements of the offense or the special issue under consideration]. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Thus, our review is a very limited one. We do not act as a thirteenth juror re-evaluating the weight and credibility of the evidence. Rather, we act only "as a final, due process safeguard ensuring ... the rationality of the factfinder." *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Crim.App.1988).

*Chambers v. State*, 903 S.W.2d 21, 24–25 (Tex.Crim.App.1995)(quoting *Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex.Crim.App.), cert. denied, —— U.S. ——, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994)). We have specifically declined to weigh the evidence or balance the defense's evidence against the State's evidence. *Burns v. State*, 761 S.W.2d 353, 356 n. 4 (Tex.Crim.App.1988)("we have abandoned any pretense of this Court balancing mitigating and aggravating evidence"); *see also Wilkerson*, 881 S.W.2d at 328–44 (Baird, J., dissenting)(urging Court to balance aggravating and mitigating evidence in reviewing sufficiency claims in capital cases).

Following is a review of the evidence viewed in a light most favorable to the verdict. Two to three weeks before the offense appellant began to plan the abduction of Allen Bolden, a life guard at the Fort Worth Boys' Club which appellant and his friends frequented. Appellant planned to ask Bol-

den for a ride and once in the car, abduct him, kill him, and drive the car to Del Rio or Mexico to sell. Appellant discussed this plan with several of his friends who agreed to go along with it. During the weeks before the offense appellant considered the details of his plan, including how he would kill Bolden. He concluded at one point that a shotgun would be too loud. Approximately three weeks after appellant had first mentioned the plan to his friends, appellant and his cohort Mike Lagunas approached Bolden as he was leaving work and asked him for a ride.[1] Bolden agreed. Once in the car Lagunas put an inoperable .22 caliber gun to Bolden's head and appellant told Bolden to drive to a remote location under a bridge. Upon arrival at the location, appellant told Bolden to get out of the car and Lagunas struck him in the head with a rock, causing him to fall to the ground. Appellant then stabbed Bolden twice in the back of the head or neck with a knife, resulting in his death. Appellant and Lagunas left the scene in Bolden's car and picked up two of their friends. Appellant told them, "We did it, man, we did it" and described stabbing Bolden. Appellant was driving. They bought some beer and continued driving around for a while. Appellant suggested that the two recent passengers (who were 14 and 15 years old at the time) use the inoperable gun to rob an ice cream truck in order to supply them with money for their trip to Del Rio. The two complied and gave the money to appellant. Later that evening appellant and three others drove to Del Rio. Appellant was stopped for speeding by a highway patrolman outside of Del Rio two days later. Appellant gave a false name and address to the patrolman who, upon learning that the car was stolen, took appellant to the county jail. Appellant was interviewed the next day by an Arlington police officer to whom he confessed.

Evidence was offered at punishment that appellant had participated in an attempted burglary of a church two months before the offense. A police officer testified that appellant's reputation for being a peaceable and law abiding citizen was bad. In addition, appellant assaulted another inmate in jail with a broom; a razor blade was confiscated from appellant's jail cell. Also found in appellant's cell was a self-portrait depicting appellant holding a bloody knife. A copy of this drawing is attached as an Appendix to this opinion. Dr. Richard Coons, a psychiatrist who testified for the State, described the drawing as reflecting appellant's image of himself:

> ... it represents his self-image. That is how he sees himself. He has got it labeled "Soria" with presumably blood dripping off the blade. He has got "Juan" written across the knuckles on this right hand, JS written on his forearm. He has got a knife dripping blood off of it. TDC is written down. He is in jail. He has got this angry, muscled, aggressive look. This is the way he sees himself. This is the way he wants to be. This is the way he sees himself.

> Now, here is a man that is awaiting trial for capital murder. And here is how he sees himself.

> That is his self-image.

Coons further testified on the basis of a hypothetical tracking the facts of the case that in his opinion there was a probability that the hypothetical defendant would commit criminal acts of violence that would constitute a continuing threat to society.[2] He pointed to the following facts as significant in support of this opinion—despite the hypothetical defendant's young age he had already committed a number of deviant acts, he had remained in school only through the

---

1. Appellant and another of his friends, Arturo Rodriguez, had asked Bolden for a ride the day before. However, the plan to kill Bolden was not carried out at that time. Rodriguez testified that appellant aborted the plan that day because he did not "know what to do with him" or "where to take him." Appellant asked Bolden to let them out shortly after getting in the car.

2. Coons testified that he had attempted to personally examine appellant, but appellant was not cooperative. Appellant introduced the testimony of a psychiatrist who had personally examined him and concluded that he did not present a continuing threat to society. However, because we view the evidence in a light most favorable to the verdict, we do not factor that opinion into our analysis or weigh his testimony against the testimony of Dr. Coons.

ninth grade and had failed to maintain employment, he had planned the offense over a period of several weeks, the planning and acting out of a murder simply to steal the victim's property indicates a lack of conscience,[3] and the hypothetical defendant's actions after the offense in driving around in the victim's car and buying beer demonstrated a lack of remorse.

We hold the evidence is sufficient to support the jury's affirmative finding. Appellant's planning of the murder weeks in advance and recruiting others to assist him, and appellant's only apparent motive for the killing being his desire to steal the victim's car in order to sell it for cash, weigh heavily in favor of the jury's verdict. Appellant was known to Bolden as a patron of the club where Bolden worked and appellant capitalized on that familiarity and Bolden's general good will in asking him for a ride. In addition, appellant had acquired a bad reputation in the community in a short period of time, his self-portrait depicted an aggressive, hostile person holding a bloody knife which a psychiatrist testified reflected his self-image and the psychiatric testimony on the basis of a hypothetical tracking the facts of the instant case that the hypothetical defendant would commit criminal acts of violence, together support the jury's verdict.[4] *See, e.g., Flores v. State*, 871 S.W.2d 714 (Tex.Crim.App.1993)(evidence sufficient on second issue where abduction of victim was committed with some forethought and deliberation, victim was stabbed repeatedly in chest, defendant went to sleep after offense,

defendant attempted to blame others for offense, and state offered psychiatric testimony that defendant would be continuing threat based on hypothetical tracking facts of case), *cert. denied,* —— U.S. ——, 115 S.Ct. 313, 130 L.Ed.2d 276 (1994); *Armstrong v. State,* 718 S.W.2d 686, 695 (Tex.Crim.App.1985)(evidence sufficient to support second issue where evidence showed premeditated planning of robbery and murder, victim shot at close range as he sat on crate without struggling or fighting, victim and defendant knew one another, defendant assaulted other inmates in jail, defendant's reputation in community was bad). **Appellant's first point of error is overruled and our disposition of this point of error on original submission is withdrawn.**

## II.

Our opinion on original submission addressed and disposed of all of appellant's points of error related to the guilt/innocence phase of trial. We adhere to our disposition of those points of error. Because we sustained appellant's first point of error on original submission and reformed his death sentence to a life sentence, we did not reach the remainder of appellant's points of error pertaining to the punishment phase of trial. We now turn to the remaining points of error.[5]

▇▇▇ In his second point of error, appellant contends the trial court erred in restricting the testimony of a defense expert at the

---

3. Coons emphasized the planning of the offense as indicative of a lack of conscience:

 ... He apparently thought about it, discussed it, planned it, over a period of time, somewhere in a one and a half week area, and discussed it with a number of people, thought about different ways of doing this. Went out one time and that didn't work out, went directly back to the plan to take someone else's life, kill them, go to Mexico to sell the car for their own profit.

 His conscience, obviously, doesn't cover that kind of behavior, doesn't prevent him from doing it.

 We look at people in terms of behavior control. Do they have a conscience which, in fact, helps them control their behavior? Does it make them feel guilty? Does it, in fact, prevent them from doing criminal kinds of acts or

violent kinds of acts? His didn't. He does not have that kind of conscience.

4. Our opinion on original submission failed to take into account Coons' testimony, appellant's self-portrait, and appellant's profiteering motive in committing the offense. In addition, some of the evidence taken into account in our opinion on original submission mitigated against the verdict and therefore should not have been factored into our analysis in viewing the evidence "in a light most favorable to the verdict" under *Jackson.*

5. On original submission we addressed points of error 1, 3, 6, 7, 8, and 24–27. In this opinion we address point of error 1 on rehearing and points 2, 4, 5, 9–23 and 28.

punishment phase of trial, in violation of his Fifth Amendment rights.[6]

The State did not offer any psychiatric testimony on the issue of future dangerousness during its punishment case in chief. Appellant called psychiatrist Dr. James Grigson who testified that he had conducted a complete psychiatric examination of appellant and had formed the opinion that appellant "does not present a continuing threat to society. That he is not dangerous in the future." In rebuttal, the State called psychiatrist Dr. Richard Coons. Coons had not conducted a psychiatric evaluation of appellant because, although ordered by the trial court to submit to an evaluation by Coons, appellant was "not cooperative" with those efforts.[7] Rather, Coons testified on the basis of a hypothetical tracking the facts of the case that in his opinion there was a probability that appellant would constitute a continuing threat to society. Coons' testimony is described in Part I of this opinion. Appellant then sought to call Dr. E. Clay Griffith. Griffith had also conducted a psychiatric evaluation of appellant. The trial court ruled that due to appellant's refusal to cooperate with Coons' examination, Griffith would not be permitted to testify to anything based upon his personal examina-tion of appellant. Griffith would be allowed to testify based upon a hypothetical. Appellant declined to call Griffith, but made a bill of exception.

■ The Fifth Amendment is implicated when a mental health expert testifies against the defendant based in part on communications made by the defendant during a court-ordered psychiatric examination. *Estelle v. Smith*, 451 U.S. 454, 462–63, 101 S.Ct. 1866, 1872–73, 68 L.Ed.2d 359 (1981). In *Estelle v. Smith*, the state offered at punishment the testimony of a psychiatrist (coincidentally, the same Dr. Grigson involved in the instant case) who had examined the defendant pretrial pursuant to a court order, for purposes of competency. Grigson testified that the defendant would be a continuing threat to society; this diagnosis rested largely upon statements made by the defendant during the pretrial examination.[8] *Smith*, 451 U.S. at 464, 101 S.Ct. at 1873–74. The testimony was held to violate the defendant's Fifth Amendment privileges since the defendant had not been informed of his right to remain silent and informed that any statements he made during the pretrial exam could be used against him in a sentencing proceeding:

A. Yes, I did. I attempted to.
Q. Did you do so?
A. He was not cooperative.
Q. Well, when you say he was not cooperative, were you prevented from doing so?
A. Only by his action, he just did not cooperate.
Q. All right. Well, was it otherwise possible for you to conduct such evaluation in the absence of his cooperation?
A. In the absence of—his failure to cooperate, it was impossible for me to do it.

**8.** Responding to the State's argument that the Fifth Amendment was not implicated because the defendant's communications were nontestimonial, the Court stated:

... Dr. Grigson's diagnosis, as detailed in his testimony, was not based simply on his observation of respondent. Rather, Dr. Grigson drew his conclusions largely from respondent's account of the crime during their interview ... Dr. Grigson's prognosis as to future dangerousness rested on statements respondent made, and remarks he omitted, in reciting the details of the crime.

*Smith*, 451 U.S. at 464, 101 S.Ct. at 1873–74.

---

**6.** Appellant asserts a Sixth Amendment claim in his brief, but we decline to address that ground since he did not raise the Sixth Amendment at trial. At trial, appellant's objection was "[b]ased upon the Fifth Amendment and [sic] of the United States Constitution and based on the similar provision in the Texas Constitution." Since appellant's brief contains only three sentences in support of his Texas Constitutional claim, we view it as insufficiently briefed and decline to address it. Appellant also asserted at trial "the Fourteenth Amendment, providing that a defendant shall enjoy due process." Appellant mentions the Fourteenth Amendment in his brief, but provides no argument or authority in support thereof.

**7.** It appears from the record that although appellant was presented to Coons for evaluation, he did not respond to Coons or otherwise answer Coons' questions. Coons testified as follows as to appellant's lack of cooperation:
Q. [The State] And, did you see the Defendant in this cause, Juan Soria?
A. [Coons] Yes, I did.
Q. All right. And did you attempt to examine him?
A. I did.
Q. Did you—tell me whether or not you attempted to conduct the psychiatric evaluation of him?

When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting.

*Id.* at 467, 101 S.Ct. at 1875.[9] The Supreme Court emphasized the specific circumstances of that case:

A criminal defendant, *who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence,* may not be compelled to respond to a psychiatrist if his statements can be used against him in a capital sentencing proceeding. Because respondent did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said to Dr. Grigson to establish his future dangerousness.

*Id.* at 468, 101 S.Ct. at 1876 (emphasis added). The Court further observed that "a different situation arises where a defendant intends to introduce psychiatric evidence at the penalty phase." *Id.* at 472, 101 S.Ct. at 1878.

The Supreme Court took the opportunity to address "a different situation" in *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). There, the defendant raised an affirmative defense of extreme emotional disturbance at the guilt phase of trial. In support of his defense the defendant called a social worker who read from several psychological evaluations which had been conducted during involuntary incarcerations in a youth center and later in an institution for emotionally disturbed youths. *Buchanan,* 483 U.S. at 409, 107 S.Ct. at 2910. The State sought to cross-examine the social worker by having her read from another report based upon an examination of the defendant following his arrest for the murder at issue; this examination had been conduct-

ed pursuant to the joint motion of the State and the defense. *Id.* at 411, 107 S.Ct. at 2911. The defendant objected to the State's rebuttal use of this evaluation as violative of his Fifth Amendment rights. The Supreme Court rejected the defendant's claim:

We recognized [in *Smith* ], however, the 'distinct circumstances' of that case, 451 U.S., at 466, 101 S.Ct., at 1874—the trial judge had ordered, *sua sponte,* the psychiatric examination and Smith neither had asserted an insanity defense nor had offered psychiatric evidence at trial. We thus acknowledged that, in other situations, the State might have an interest in introducing psychiatric evidence to rebut petitioner's defense.... We further noted [in *Smith* ]: "A criminal defendant who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." [citation omitted] This statement logically leads to another proposition: *if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.*

*Id.* at 422–23, 107 S.Ct. at 2917–18 (emphasis added). The Court noted that the psychiatric testimony offered by the State did not "describe[ ] *any* statements by petitioner dealing with the crimes for which he was charged." *Id.* at 423, 107 S.Ct. at 2918 (emphasis in original).

█ Courts have viewed *Buchanan* as recognizing that a defendant "waives" his Fifth Amendment rights to a limited extent by presenting psychiatric testimony on his behalf. *See, e.g., Schneider v. Lynaugh,* 835 F.2d 570, 575–76 (5th Cir.)(referring to *Buchanan* as involving concept of "waiver," although acknowledging that *Buchanan* did

---

9. The Court also held that under the Sixth Amendment defense counsel must be given prior notice of a court-ordered psychiatric examina-

tion and given an opportunity to advise his client regarding the extent of his cooperation therewith.

not use that term), *cert. denied,* 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988); *Wilkens v. State,* 847 S.W.2d 547 (Tex.Crim.App. 1992), *cert. denied,* 507 U.S. 1005, 113 S.Ct. 1646, 123 L.Ed.2d 268 (1993). The notion of waiver has been explained by the Fifth Circuit as deriving from a defendant's "constructive" testimony: [10]

> ... By introducing psychiatric testimony obtained by the defense from a psychiatric examination of the defendant, the defense constructively puts the defendant on the stand and therefore the defendant is subject to psychiatric examination by the State in the same manner.

*Battie v. Estelle,* 655 F.2d 692, 702 n. 22 (5th Cir.1981). In other words, introduction by the defense of psychiatric testimony based upon an examination of the defendant "constitute[s] a waiver of the defendant's fifth amendment privilege *in the same manner as would the defendant's election to testify at trial."* *Id.* at 701–702 (referring to its holding in *United States v. Cohen,* 530 F.2d 43 (5th Cir.)(emphasis added), *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976)).

In *United States v. Byers,* 740 F.2d 1104 (D.C.Cir.1984), the defendant claimed the government "forced from his lips (via [a] compelled [psychiatric] examination) the evidence to negate his defense of insanity and thereby proved, indirectly through rebuttal, that he was of the necessary mind to commit the crimes." *Id.* at 1109. Writing for the D.C. Circuit, then federal circuit Judge Scalia noted that virtually all other jurisdictions had addressed this issue and uniformly concluded that when a defendant raises the defense of insanity, the Fifth Amendment is not violated by a court-ordered psychiatric examination conducted by a psychiatrist of the court's or government's choosing, or by that expert's testimony on the issue of sanity. *Id.* at 1111. Judge Scalia discussed the various rationales relied upon in support of these holdings, concluding that the most sensible justification was the need to maintain a fair

state-individual balance. *Id.* at 1113. This rationale is supported by the same principles that compel a defendant to undergo cross-examination once he elects to take the stand in his own behalf:

> Our judgment that these practical considerations of fair but effective criminal process affect the interpretation and application of the Fifth Amendment privilege against self-incrimination is supported by the long line of Supreme Court precedent holding that the defendant in a criminal or even civil prosecution may not take the stand in his own behalf and then refuse to consent to cross-examination. [citations omitted] The justification for this similarly "coerced" testimony is precisely that which we apply to the present case. As said [by the United States Supreme Court] in *Brown[ v. United States],* a defendant
>
> > cannot reasonably claim that the Fifth Amendment gives him not only this choice [whether to testify or not] but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell.... The interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.
>
> 356 U.S. at 155–56, 78 S.Ct. at 626–27 (footnote & citation omitted).

*Id.* at 1114. The court thereupon held that "when a defendant raises the defense of insanity, he may constitutionally be subjected to compulsory examination by court-appointed or government psychiatrists ... and when he introduces into evidence psychiatric testimony to support his insanity defense, testimony of those examining psychiatrists may

---

10. The Supreme Court has acknowledged the Fifth Circuit's discussions in this respect and observed that "[l]anguage contained in *Smith* and our later decision in *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), provides some support for the Fifth Circuit's discussion of waiver [in *Battie* ]." *Powell v. Texas,* 492 U.S. 680, 684, 109 S.Ct. 3146, 3149, 106 L.Ed.2d 551 (1989).

be received (on that issue) as well." *Id.* at 1115.

This Court has held that by raising an insanity defense at guilt and offering psychiatric evidence in support thereof, the defendant waives his Fifth Amendment rights as to the State's use of psychiatric evidence in rebuttal on that issue.[11] *Wilkens v. State,* 847 S.W.2d 547, 551 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 1005, 113 S.Ct. 1646, 123 L.Ed.2d 268 (1993)(recognizing *Buchanan* as controlling). We have also held that a defendant "opens the door" to the State's rebuttal use of psychiatric evidence at punishment when the defendant presents psychiatric evidence in his defense at punishment. In *Hernandez v. State,* 805 S.W.2d 409, 412 (Tex.Crim.App.1990), *cert. denied,* 500 U.S. 960, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991), a capital murder case, the defendant was examined pretrial by Dr. Sparks as to his competency, but was not given proper *Miranda* [12] warnings prior to the examination. He complained on appeal that the trial court violated his Fifth Amendment rights by allowing Sparks to testify for the State at punishment as to matters pertaining to that examination. Relying on the Supreme Court's limiting language in *Smith* and its holding in *Buchanan,* we rejected the defendant's claim:

11. We further held, however, that the defendant's presentation of an insanity defense at guilt did not prevent him from asserting his Fifth Amendment rights against the State's presentation of psychiatric evidence as to the punishment issue of future dangerousness. *Wilkens,* 847 S.W.2d at 554.

12. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Under *Miranda,* prior to custodial interrogation a suspect must be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444, 86 S.Ct. at 1612.

13. Sparks was specifically prohibited from expressing an opinion as to the defendant's future dangerousness. *Hernandez,* 805 S.W.2d at 412 n. 3. His testimony for the State concerned his diagnosis of appellant as exhibiting an anti-social personality disorder.

14. While this Court is not bound by federal circuit courts of appeals in interpreting the United

. . . the State elicited redirect testimony from Dr. Sparks concerning appellant's competency evaluation in response to appellant's introduction of psychiatric evidence on cross-examination. By introducing appellant's TDC psychiatric records and soliciting Dr. Sparks' opinion concerning those records, appellant "opened the door" to the State's use of the results of his competency exam for rebuttal purposes. *Buchanan,* supra, and cases cited above. By creating the impression that appellant may have been suffering from paranoid schizophrenia, appellant paved the way for the State to rebut that impression with psychiatric testimony tending to show that appellant was instead suffering from an anti-social personality disorder.

*Hernandez,* 805 S.W.2d at 412. We observed that while the psychiatric testimony at issue pertained to the defendant's mental status and was therefore *"relevant* to the issue of future dangerousness, [it] was not a direct assertion of an expert opinion concerning future dangerousness."[13] *Id.* at 412 n. 3.

We see no reason why the principles set forth in *Smith* and *Buchanan,* and applied by this Court in *Wilkens* and *Hernandez,* should not apply at punishment with respect to the presentation of psychiatric testimony on the issue of future dangerousness.[14] *See*

States Constitution, we often look to them for guidance and are sometimes persuaded by their reasoning. The Fifth and Fourth Circuits have applied the principles set forth in *Buchanan* to hold that a capital murder defendant is prevented from asserting his Fifth Amendment rights by offering psychiatric testimony at punishment on the issue of future dangerousness. *See, e.g., Giarratano v. Procunier,* 891 F.2d 483, 488 (4th Cir.1989)(holding defendant's stated intention to introduce psychiatric testimony at sentencing enabled State to introduce psychiatric testimony on issue of future dangerousness based on pretrial examination, even though defendant had not been warned that statements made could be used against him at punishment); *Schneider v. Lynaugh,* 835 F.2d 570, 576–77 (5th Cir.), *cert. denied,* 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988); *Williams v. Lynaugh,* 809 F.2d 1063, 1068–69 (5th Cir.), *cert. denied,* 481 U.S. 1008, 107 S.Ct. 1635, 95 L.Ed.2d 207 (1987). In *Schneider,* supra, the defendant was evaluated pretrial at his request by a court-appointed psychiatrist (again, Dr. Grigson) to determine his competency and sanity. At punishment the defendant offered three witnesses—a drug abuse

*Schneider v. Lynaugh,* 835 F.2d 570, 576–77 (5th Cir.), *cert. denied,* 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988).

In testifying for appellant, Grigson described his examination of appellant as consisting of several parts, one of which involved talking to appellant about "what [appellant was] doing on or around or about the time of the alleged offense."[15] Grigson explained that appellant's expressed remorse, in contrast to the attitudes of most capital murder defendants, was part of the reason for his conclusion that appellant would not present a continuing threat to society:

> ... [appellant] was very upset about what happened. He felt very guilty. He wished he could bring back the dead boy. He praised to God. He has remorse and guilt feelings which normally I don't encounter in these types of situations.... He has nightmares. Feels very badly about what he did. And primarily due to his reaction and then comparing it with others I have examined, it is my opinion that he does not present that continuing threat to society.

Grigson further explained that appellant's expressed insecurities led him to associate with the wrong friends:

> ... And then from an emotional standpoint, [appellant] feels insecurity as a male, which I think in part gets him into the wrong group, trying to feel more macho, if

you will, more sure of himself. But basically, he is insecure with his masculinity.

When asked about appellant's prospects at rehabilitation, Grigson emphasized that appellant "is aware of what he did, so I don't think that he is ever going to go through that again."

On cross-examination Grigson stated that his knowledge of the offense was based primarily on what appellant had told him:

Q.... You have mentioned that you were aware of the events of Thursday, June the 27th, 1985?

A. Yes, sir.

Q. How did you become aware of those events?

A. From [appellant], what he told me.

Q. Okay. So, that the entire amount of information that you have in reference to Thursday's events are from [appellant], either directly or from his statement; is that correct?

A. Yes, sir, that is true.

Q. And I take it that you have based at least your knowledge of those events on his version of what he intended to do that Thursday; is that correct?

A. Yes, sir, I did.

Q. The same would be true, I take it, of his version of of [sic] the events that oc-

---

counselor, an employee in a rehabilitation program at the jail where the defendant was held, and a jail chaplain—who all testified that the defendant could be rehabilitated. The State rebutted by presenting Grigson's testimony that the defendant's past criminal behavior would continue and there was no chance that the defendant could be rehabilitated. The defendant claimed that the State's use of such testimony violated his Fifth Amendment rights since he had not been informed of those rights before Grigson's pretrial examination. The Fifth Circuit concluded that the case was governed by the principle established in *Buchanan*—that "a defendant who puts his mental state in issue with psychological evidence may not then use the Fifth Amendment to bar the State from rebutting in kind." *Schneider,* 835 F.2d at 575. The Court emphasized *Buchanan's* attempt to strike a "fair state-individual balance:"

> It is unfair and improper to allow a defendant to introduce favorable psychological testimony and then prevent the prosecution from resort-

ing to the most effective and in most instances the only means of rebuttal: other psychological testimony.

*Id.* at 576. Concluding that the defendant had put his mental state in issue by calling three expert witnesses who testified to his ability to be rehabilitated, the Court held that "the only effective means" available to the State for rebuttal was the presentation of independent psychological evidence. *Id.* at 577.

15. Grigson described this portion of the examination:

> Then, the fourth part of the psychiatric examination is called content of thought. Here you obtain historical information which includes birth and early development, educational history, service, occupational, marital, family, medical history. And then *a real importance, when you have an individual that is charged with a criminal offense, is the ability of the individual to discuss what they were doing on or around or about the time of the alleged offense.*

curred that Friday. You took it from his statement, didn't you?

A. Yes, sir, his confession and as well as what he told me, yes, sir.

On redirect, Grigson emphasized appellant's expressions of remorse as an indication that he would not be a future danger:

... his reaction to what happened causes him to be a whole lot less likely to ever do anything like this again in the future because of the pain, the regret, the remorse, what he has done to the boy's family, what happened to the boy, what he has done to his family, as well as what happened to himself.

By presenting Grigson's testimony as to appellant's remorse and other feelings appellant expressed to him concerning the offense, appellant constructively placed himself on the stand. *Cf. Battie,* supra; *Byers,* supra.

When a defendant takes the stand in his own defense, he "is subject to the same rules governing direct examination and cross-examination as any other witness." *Bryan v. State,* 837 S.W.2d 637, 643 (Tex.Crim.App. 1992). He may be " 'contradicted, impeached, discredited, attacked, sustained, bolstered up, made to give evidence against himself, cross-examined as to new matter, and treated in every respect as any other witness testifying, except where there are overriding constitutional or statutory prohibitions.' " *Id.* We have recognized the tough

choices facing a defendant when deciding whether to testify in his defense:

... a defendant has a very difficult choice to make: should he waive his right against self-incrimination on all relevant issues, knowing some unfavorable evidence might result from cross-examination; or should he retain that right and yet not put his version of some aspect of the case before the jury.... This difficult decision does not impose an impermissible burden upon the exercise to Fifth Amendment rights. No constitutional violation is presented by the fact of a difficult decision for a defendant.

*Cantu v. State,* 738 S.W.2d 249, 256 (Tex. Crim.App.), *cert. denied,* 484 U.S. 872, 108 S.Ct. 203, 98 L.Ed.2d 154 (1987).

■ Appellant chose to present his version of the facts as they might impact his death-worthiness through Grigson's testimony. The State's only effective means of rebutting appellant's constructive testimony was by presenting independent psychiatric testimony.[16] *See, e.g., Buchanan,* supra; *Byers; United States v. Vest,* 905 F.Supp. 651, 653 (W.D.Mo.1995); *Schneider,* supra. We accordingly hold that when the defendant initiates a psychiatric examination and based thereon presents psychiatric testimony on the issue of future dangerousness, the trial court may compel an examination of appellant by an expert of the State's or court's choosing[17] and the State may present rebut-

---

(emphasis added).

16. In *Byers,* Justice Scalia rejected the contention that cross-examination of the defendant's expert would satisfy the necessary balance in this context:

That would perhaps be so if psychiatry were as exact a science as physics, so that, assuming the defense psychiatrist precisely described the data (consisting of his interview with the defendant), the error of his analysis could be demonstrated. It is, however, far from that. Ordinarily the only effective rebuttal of psychiatric opinion testimony is contradictory psychiatric opinion testimony; and for that purpose ... "the basic tool of psychiatric study remains the personal interview, which requires rapport between the interviewer and the subject."

*Byers,* 740 F.2d at 1114.

17. In *Buchanan* the rebuttal testimony offered by the State was based upon an examination conducted *pursuant to the defendant's request;* this

was also the case in *Wilkens* and *Hernandez.* However, this fact does not bear upon our holding. Once a defendant constructively testifies in his own behalf, he is subject to "constructive" cross-examination by the State through examination by a court-appointed expert (of the State's or court's choosing).

We also recognize that in *Bennett v. State,* 742 S.W.2d 664, 671 (Tex.Crim.App.1987), we held that a trial court does not "have the authority to appoint a psychiatrist for the purpose of examining a defendant for evidence relating solely to his future dangerousness." That case is distinguishable from the facts presented in the instant case. The defendant in *Bennett* had not presented psychiatric evidence; the State sought to compel an exam *for purposes of introducing direct testimony* on the issue of future dangerousness, not rebuttal. In the instant case, appellant constructively testified by presenting psychiatric testimony based upon an examination of the defendant and the State sought to offer rebuttal evidence.

tal testimony of that expert based upon his examination of the defendant; provided, however, that the rebuttal testimony is limited to the issues raised by the defense expert.[18] *See Williams v. Lynaugh,* 809 F.2d 1063, 1068 (5th Cir.1987)(recognizing that when defendant introduces psychiatric evidence on critical issue he "waives" fifth amendment objections to state's use of psychiatric testimony provided state's evidence is "used solely in rebuttal and properly limited to the issue raised by the defense," citing *Vardas v. Estelle,* 715 F.2d 206 (5th Cir. 1983)). We emphasize that the State's expert may only testify on the basis of state-ments made during such examination that were the "product of a rational intellect and a free will." [19] *See Mincey v. Arizona,* 437 U.S. 385, 397–98, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978)(while statements made by defendant in violation of *Miranda* are admissible against defendant for impeachment purposes, such statements must be "the product of a rational intellect and free will"). In other words, the statements must be voluntary.

Of course, no one can be literally *forced* to speak against their will, as demonstrated by appellant's refusal to cooperate with Coons

**18.** We are not asked to decide today whether a defendant is entitled to suppression at trial of statements made during a compelled examination. In the context of a sanity defense, federal rules provide that certain statements made by the defendant during the examination must be excluded. Fed. R.Crim. P. 12.2(c). Some federal courts have pointed to this safeguard in upholding compelled examinations. *See Cohen,* 530 F.2d at 47–48 (concluding that since statements about the offense could be suppressed, a rule forbidding compelled examinations would "prevent no threatened evil"). The Texas Code of Criminal Procedure provides for the exclusion at guilt of statements made by the defendant during a competency exam. Tex. Code Crim. Proc. Ann. art. 46.02 § 3(g); *see also DeRusse v. State,* 579 S.W.2d 224, 229 (Tex.Crim.App.1979)(article 46.03, pertaining to sanity examination does not contain prohibition against use of defendant's statements similar to prohibition found in article 46.02 § 3(g)).

We notice that in *Buchanan,* the rebuttal testimony did not "describe[ ] *any* statements [sic] by petitioner dealing with the crimes for which he was charged." *Buchanan,* 483 U.S. at 423, 107 S.Ct. at 2918 (emphasis in original). We are likewise not presented with that issue. Because appellant did not cooperate in the State's examination, no question is raised as to Coons' testimony regarding statements made by appellant during such examination and appellant makes no such claim as to Coons' brief observation of him or Coons' testimony as to appellant's lack of cooperation.

**19.** In *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the Supreme Court held that statements given in violation of *Miranda* could nevertheless be offered by the prosecution for purposes of impeaching the defendant's testimony, "provided of course that the trustworthiness of the evidence satisfies legal standards." *Id.* at 224, 91 S.Ct. at 645. The Court held that once petitioner chose to take the stand, "the shield provided by *Miranda*" did not protect him from being confronted with a prior inconsistent statement. *Id.* at 225–26, 91 S.Ct. at 645–46. In *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Supreme Court held that the rule set forth in *Harris* requires that such statements be voluntarily made:

> Statements made by a defendant in circumstances violating the strictures of *Miranda v. Arizona, supra,* are admissible for impeachment if their "trustworthiness ... satisfies legal standards." [citing *Harris v. New York* ] But any criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law, "even though there is ample evidence aside from the confession to support the conviction."

*Mincey,* 437 U.S. at 397–98, 98 S.Ct. at 2416. Due process mandates that statements given to law enforcement that are not the "product of a rational intellect and a free will" may not be used against a defendant at trial for any purpose. *Id.* at 398–402, 98 S.Ct. at 2416–19. The Supreme Court noted that it was "hard to imagine a situation less conducive to the exercise of 'a rational intellect and a free will' than Mincey's[:]"

> [Mincey] had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician. Although he had received some treatment, his condition at the time of [the officer's] interrogation was still sufficiently serious that he was in the intensive care unit. He complained to the [interrogating officer] that the pain in his leg was "unbearable". He was evidently confused and unable to think clearly about the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent. Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus. He was, in short, "at the complete mercy" of [the officer], unable to escape or resist the thrust of [the officer's] interrogation.

*Id.* at 398–99, 98 S.Ct. at 2416–17 (footnotes omitted).

despite the trial court's order. The question then is whether a court can impose sanctions due to a defendant's refusal to comply with a court-ordered examination.

In the context of a court-ordered sanity exam, exclusion of the defendant's expert testimony has been suggested as a sanction for the defendant's refusal to cooperate:

> ... [O]nce a defendant indicates his intention to invoke the insanity defense and present expert testimony on the issue, he may be ordered to submit to a psychiatric examination by psychiatrists available to testify for the government, and his *refusal to talk to the State's psychiatrists may be sanctioned by the court at the least by exclusion of defendant's own experts' testimony on the insanity issue.* [citations omitted] The necessary predicate of that position is that once the defendant indicates his intention to present expert testimony on the insanity issue, the privilege against self-incrimination does not thereafter protect him from being compelled to talk to the State's expert witnesses....

*Karstetter v. Cardwell*, 526 F.2d 1144, 1145 (9th Cir.1975)(emphasis added). A more extreme sanction is forfeiture of the defendant's right to assert his insanity defense altogether. *See United States v. Leonard*, 609 F.2d 1163, 1165 n. 3 (5th Cir.1980).

Limiting the testimony of the defendant's rebuttal expert to the same extent that the State's expert was limited due to the defendant's failure to cooperate is a fair and reasonable sanction.[20] Just as the defendant's Fifth Amendment rights no longer protect him from being ordered to submit to an examination in these circumstances, neither do they protect him from the trial court's ability to enforce such order. *Cf. Karstetter*, supra. The trial court did not abuse its discretion in ordering that Griffith be limited to testifying on the basis of a hypothetical.

**Appellant's second point of error is overruled.[21]**

In his fourth and fifth points of error, appellant claims the trial court erred in admitting into evidence at the punishment stage of trial a drawing, a copy of which is attached as an Appendix hereto. Appellant argues that the drawing was not relevant because there is no evidence that appellant drew it. Appellant also argues that the search of his jail cell and the seizure of the drawing were unlawful under the Fourth and Fourteenth Amendments to the United States Constitution.[22] Appellant points out that the drawing was not a weapon or contra-

---

20. We emphasize that this case does not involve a question of limiting the testimony of a defense expert offered in the defense case in chief where the defendant has merely *expressed an intention* to introduce psychiatric evidence. Here, appellant has actually *presented* psychiatric testimony on his behalf, thereby constructively testifying. It is appellant's constructive testimony that gave rise to the waiver of his Fifth Amendment rights and ultimately the ability of the trial court to compel an examination and to enforce that order.

21. We are aware of *Bradford v. State*, 873 S.W.2d 15, 20 (Tex.Crim.App.1993), cert. denied — U.S. ——, 115 S.Ct. 311, 130 L.Ed.2d 274 (1994), in which a plurality of this Court held that the trial court's order making the admissibility of portions of the defense expert's testimony on future dangerousness contingent upon the defendant's submission to an examination as to that issue by the State's expert violated the defendant's Sixth Amendment right to effective assistance of counsel, and the admission of State's expert's testimony under these circumstances violated the defendant's Fifth Amendment right against self-incrimination. We decline to follow *Bradford*. The plurality in that

decision recognized our opinion in *Hernandez*, supra, but distinguished that case on the ground that the experts there did not directly testify on the issue of future dangerousness. This distinction is not consistent with the basis of our opinion in *Hernandez*. Our opinion in that case was not *predicated* in any respect on the fact that the expert did not express a direct opinion on the issue of future dangerousness. Rather, our holding was predicated on the rationale underlying *Buchanan*, that

> By introducing appellant's TDC psychiatric records and soliciting Dr. Sparks' opinion concerning those records, appellant "opened the door" to the State's use of the results of his competency exam for rebuttal purposes. *Buchanan*, supra, and cases cited above.

*Hernandez*, 805 S.W.2d at 412. We continue to follow the principles established in *Buchanan* in our holding today. *See Wilkens*, supra; *Hernandez*, supra.

22. Appellant also cites Article I, §§ 9 and 19 of the Texas Constitution and Tex. Code Crim. Proc. Ann. art. 1.06 and 38.23, but he fails to makes a separate argument or cite separate authority in support thereof.

band and therefore its seizure did not serve any legitimate prison administrative concern.

■ The Supreme Court has held that a prisoner has no Fourth Amendment expectation of privacy in his cell. *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Moreover, a shakedown search of a pretrial detainee's cell does not violate the Fourth Amendment or due process. *Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). Accordingly, the "shakedown" search of appellant's cell was reasonable.

■ In *Hudson v. Palmer*, the respondent claimed the destruction of his personal property was an unreasonable seizure under the Fourth Amendment. 468 U.S. at 528 n. 8, 104 S.Ct. at 3201 n. 8. The Court rejected that contention:

> ... the same reasons that lead us to conclude that the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures. Prison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests.

*Id.* We think the same reasoning applies in the context of pretrial detention in jail. *See Rutherford*, 468 U.S. at 584–91, 104 S.Ct. at 3231–35 (conditions of pretrial detention should be reasonably related to legitimate governmental objective and courts should defer to sound discretion of institutional officials). It was not unreasonable for jail officials to conclude that the drawing at issue disserved legitimate institutional interests.

■ We also reject appellant's contention that the drawing was not relevant because he was not shown to be the author. Authorship need not be shown by a signature, but can be shown circumstantially. Evidence that the drawing was found in appellant's cell was sufficient connection to render the drawing relevant and permit the State to make the argument that it was appellant's drawing. **Points of error four and five are overruled.**

In his ninth point of error appellant claims the trial court erred in failing early on during voir dire to tell appellant whether or not the court's instructions would include a definition of "deliberately" and if so what that definition would be. Appellant contends he was unable to conduct effective voir dire examinations absent that information. This exact claim was addressed and rejected by this Court in *Clark v. State*, 881 S.W.2d 682, 687 (Tex.Crim.App.), *cert. denied* —— U.S. ——, 115 S.Ct. 1114, 130 L.Ed.2d 1078 (1994). **Appellant's ninth point of error is overruled.**

■ In point of error ten appellant claims "the trial court erred in limiting the voir dire examination of venireman James Chandler Pollard regarding his feelings on whether intentional conduct would automatically satisfy punishment question number one's requirement that the conduct was committed with the reasonable expectation that the death of the deceased or another would result."

During voir dire of venireperson Pollard appellant asked the following question:

> If you'd already found that the defendant's conduct was intentional, can you envision any set of circumstances where you would find that it was not done with the reasonable expectation that the death of the deceased or another would result?

The State objected to the question on the ground that it was improper to divide the special issue "into segments." The State's objection was sustained. Appellant contends the question was proper and should have been allowed.

■ The first special issue asked the jury "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result[.]"

Tex. Code Crim. Proc. Ann. art. 37.071. This issue can be viewed as consisting of two separate queries: one, whether the conduct was committed deliberately, and two, whether the conduct was committed with the reasonable expectation that death would result. We have held that there is a distinction between intentional and deliberate conduct; deliberate conduct is something more than intentional, but less than premeditation. *Hernandez v. State*, 819 S.W.2d 806, 810

(Tex.Crim.App.1991), *cert. denied* 504 U.S. 974, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992). We have repeatedly recognized that a venireperson who cannot distinguish between intentional and deliberate conduct is impaired in his ability to consider the first special issue, and is challengeable for cause. *See, e.g., Bigby v. State,* 892 S.W.2d 864, 882 (Tex.Crim.App.1994); *Martinez v. State,* 763 S.W.2d 413, 419 (Tex.Crim.App.1988). However, the second part of the first issue does not appear to require anything that can be meaningfully distinguished from intentional conduct in the context of intentional murder. The Texas Penal Code provides that

> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

Tex. Penal Code Ann. § 6.03(a). A person commits the underlying "murder" in a capital offense if he "intentionally causes the death of an individual." A logical reading of the second part of the first special issue and the definition of intentional murder leads to the conclusion that the first is very nearly encompassed within a finding of the latter. We have previously recognized the same. In *Garcia v. State,* 887 S.W.2d 846, 855 (Tex. Crim.App.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995), where a venireperson agreed that once intentional murder was found, one would invariably also find a reasonable expectation that death would result, we acknowledged that "It also makes sense to this Court that if a person intentionally kills someone, that person reasonably expects death to result[.]" For this reason, we think it obvious that the crux of the first special issue is the deliberateness question. Given that the critical inquiry presented in the first special issue is the question of deliberate conduct, we hold the trial court did not abuse its discretion in ruling that appellant could not phrase his question such that the venireperson was asked only to address the second portion of the special issue. *See Garcia,* supra. **Point of error ten is overruled.**

In point of error eleven appellant claims the trial court erred in granting the State's challenge for cause against venireperson Dora Garza Palacios on the ground that her views regarding the death penalty disqualified her.

The State's voir dire of Palacios, focusing largely on whether she could follow the law and answer the special issues affirmatively if proven beyond a reasonable doubt, took approximately one and one half hours. The State repeatedly attempted to elicit direct responses to direct and properly phrased questions about her personal views concerning the death penalty and whether she could put those views aside and answer the issues according to the evidence. Palacios' answers reflect that she was overwhelmed by the gravity of the task and was virtually unable to give a direct answer. Although at one point in responding to questions from the trial court she stated that she could answer the special issues, "yes" according to the evidence, that response was an anomaly. She continually expressed difficulty with the punishment phase of trial and evaded a direct response as to whether she could follow the law. Palacios repeatedly stated that the task as a juror on *punishment would* "be hard" for her, but would not state whether or not she could or could not follow the law. Upon granting the State's challenge for cause, the trial court stated for the record:

> Mrs. Palacios, under the circumstances and listening to your answers in their entirety, and I know it has been a long time. We have been at this right at an hour and a half, with a little short break. I feel like viewing your answers in its totality that you wouldn't be able to fairly consider the law in regard to the death penalty as the procedure was explained to you. So I am going to excuse you from serving in this case. . . . And I watched you and listened to you. And I know how hard it was for you. But listening to your answers and watching you and observing how you were affected by struggling with all of these things, I am going to go ahead and excuse you at this time.

The most current controlling authority on this issue is *Riley v. State,* 889 S.W.2d 290 (Tex.Crim.App.1993) (opinion on rehearing). There, the defendant claimed a venireperson

was improperly excluded because her views on the death penalty would not have "substantially impaired" her performance. The venireperson initially testified that she did not believe in the death penalty and could not personally participate in a proceeding that resulted in the handing down of a death sentence. However, after the special issues were explained to her, she testified that in view of the oath she would take as a juror, she could put her personal objections aside and answer the issues in accordance with the evidence. We noted that "[s]he testified unequivocally that her opposition to the death penalty would not substantially impair her ability to follow her oath and render a true verdict." *Id.* at 297. We held that she should not have been excluded:

> [t]hat it would be difficult, or even that it would unquestionably violate her conscious, however, does not lend support to a finding that [this venireperson] was substantially impaired.... So long as she consistently affirmed that she could in fact answer the special issues in accordance with the evidence, neither the difficulty she may have in doing so, nor the fact it might violate her conscience, renders her a 'vacillating' venireman in any material sense.

*Id.* at 300. However, when the venireperson vacillates or equivocates on their ability to follow the law, the reviewing court must defer to the trial court's judgment. *Id.*

Review of Palacios' entire voir dire testimony reflects that she was tormented by the gravity of the task to the extent that she was unable to directly answer the State's questions as to whether she could follow the law and answer the issues according to the evidence. In view of the equivocal and indirect nature of Palacios' responses, and her apparent struggle over whether she could remain impartial, we defer to the trial court. We hold the trial court did not abuse its discretion in concluding that Palacios was challengeable for cause. **Point of error eleven is overruled.**

In points of error twelve, thirteen, and fourteen, appellant complains of the trial court's overruling of his challenges for cause with respect to three venirepersons whom he contends would have required a "diminished burden of proof" on the first special issue. Specifically, he argues that because these venirepersons could not distinguish between the second portion of the first special issue—whether the defendant acted with the reasonable expectation that death would result—and intentional murder, they were challengeable for cause.

We addressed and rejected this identical contention in *Garcia,* 887 S.W.2d at 855. There, the defendant asked the venireperson whether having found intentional conduct,

> ... wouldn't you find invariably that I would reasonably expect that the death would result? If you had already found that I had intentionally killed them, would you not always find that, of course, I reasonably expected the death would result?

The venireperson responded, "Makes sense." We said:

> It also makes sense to this Court that if a person intentionally kills someone, that person reasonably expects death to result; however, in this context, whether that killing was also committed deliberately is still in question. It cannot be inferred, from this ambiguous series of questions, that this venireperson would always answer the first question, in its entirety, in the affirmative.

*Id.* at 855. We accordingly held the trial court did not abuse its discretion in overruling the defendant's challenge for cause. We adhere to that holding. **Points of error twelve, thirteen, and fourteen are overruled.**

In points of error fifteen and sixteen appellant claims the trial court erred in overruling his challenges for cause against two venirepersons whom he alleges were unable "to give fair consideration to a life sentence, subject to possible parole, for the offense of capital murder."

During voir dire of venireperson Richard Duane Dunlap, appellant stated that in a murder case the jury would receive an instruction informing them not to consider the operation of parole laws. Applicant further stated that in contrast to a murder case, in a capital murder case, the jury would not be given an instruction as to parole. Appellant

then asked Dunlap if that distinction suggested to him that "a person convicted of capital murder is not subject to being paroled?" Dunlap responded that it did and also agreed with appellant that he would not be comfortable with a capital murder convict being released on parole.

During appellant's voir dire of venireperson Colin Russell Curle the following exchange occurred:

[Defense counsel]. What do you think about the propriety—the State of Texas asked you how you felt about giving someone the death penalty. What are your feelings about sentencing someone to life in prison, when they have been convicted of capital murder?

[Curle]. Yes, I can. Because as long as that is where they stayed for the duration.

Appellant contends that Dunlap and Curle were challengeable for cause because "in assessing punishment in a capital murder case, a life sentence subject to the possibility of parole was not a punishment to which they could give fair consideration." Appellant argues that Dunlap's and Curle's belief that capital defendants should not be paroled would influence them if they discovered that capital defendants can become eligible for parole.

Parole is not a proper consideration for the jury in a capital murder case. Neither Dunlap nor Curle testified that they knew of the operation of parole laws as to capital murder convicts, nor did they testify that the possibility of parole would impair them in answering the special issues in accordance with the court's instructions and the law. Dunlap testified that he would be able to follow instructions in a murder case not to consider the operation of parole laws and that he would not adjust the sentence to account for the possibility of parole.[23] Appellant has made no showing that Dunlap would not act likewise in answering the special issues in a capital case. In addition, although appellant points to Curle's statement that he had no problem sentencing a capital defendant to life "as long as that is where they stayed for the duration," he makes no showing that Curle

would be impaired in answering the special issues if he knew that parole was a possibility. The trial court specifically questioned Curle as follows:

[Court]: ... Both sides have indicated to you that the punishment for capital murder is life in prison or the death penalty, depending on how the questions are answered.

And I believe one side or the other, and I can't remember which side it was, talked to you about that you could not consider parole in answering questions or determining what punishment to assess. You understand that?

[Curle]: Uh-huh.

[Court]: So—and I believe you answered affirmatively that that would not enter into your consideration in setting your punishment or in answering any of these questions; is that correct?

[Curle]: Yes, sir.

The trial court did not abuse its discretion in denying appellant's challenges for cause against these two venirepersons. **Points of error fifteen and sixteen are overruled.**

■ In point of error seventeen appellant claims the trial court erred in overruling his challenge for cause against venireperson Dunlap because Dunlap could not consider the full range of punishment for the offense of murder. Appellant argues that Dunlap was prejudiced against the law that permits the jury to impose a $10,000 fine in a murder case in which the defendant is sentenced to life or 99 years in prison. Appellant points to the following testimony:

[Defense counsel]: The range of punishment for murder is, as you know, it is between five years' probation, if the defendant is eligible for probation.... And up to 99 years or life and a $10,000 fine.

[Dunlap]: Uh-huh.

[Defense counsel]: If, as a juror, you and I guess your other 11 jurors assess a convicted murderer's punishment at 99 years or life ... in prison ... can you imagine a set of circumstances where, whatever be

---

**23.** Dunlap agreed that he would follow such an instruction in a murder case and stated that he

would not "add on to the sentence to try to make up for this parole."

appropriate, to tack on in addition to that a $10,000 fine?

[Dunlap]: Not really. To me, it seems like if a person—99 years or life, what is $10,-000? It don't mean nothing. What is money?

We do not reach the merits of appellant's claim because error, if any, was harmless since the issue of murder as a lesser included offense was not raised in this case. In *Santana v. State*, 714 S.W.2d 1 (Tex.Crim.App. 1986), the defendant was not allowed to question venirepersons about the lesser included offense of murder and its range of punishment. We held that although the trial court erred in so restricting voir dire, such error was harmless because the issue of the lesser included offense of murder was not raised under the facts of the case. *Id.* at 10; *see also Jones v. State*, 843 S.W.2d 487 (Tex. Crim.App.1992)(any error in denying defendant right to voir dire on parole law applicable to lesser included offense of murder harmless since no charge given on parole law), *cert. denied* 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). That reasoning applies here. The lesser included offense of murder was not raised in this case. Thus, any prejudice Dunlap had as to the range of punishment applicable in a murder case was harmless. **Point of error seventeen is overruled.**

In points of error eighteen and nineteen appellant claims the trial court erred in refusing to allow him to question venireperson John Alfred Lewis and other venirepersons about specific mitigating factors. In point of error twenty appellant claims the trial court erred in refusing to allow him to question venireperson Johnathan Eugene Crow about voluntary intoxication as a mitigating factor.

During appellant's voir dire of venireperson Lewis appellant asked whether "regardless of what the other evidence would show, could you consider evidence of immaturity on the part of the defendant?" The trial court sustained the State's objection to the form of the question as an attempt to bind the venireperson to view the factor as mitigating. Appellant read into the record the following other questions he wanted to ask Lewis:

No matter what the other evidence would show, could you consider the youthful age of the Defendant as a mitigating factor in setting punishment.

No matter what the other evidence would show, could you consider evidence of other extenuating, mitigating circumstances.

No matter what the other evidence would show, could you consider the element of mercy for the Defendant as a mitigating factor.

No matter what the other evidence would show, whether or not at the time of the commission of the offense, whether the Defendant was acting under duress or under the domination of another as a mitigating factor.

No matter what the other evidence would show, could you consider as a mitigating factor whether or not at the time of the commission of the offense, whether the Defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity, but more than the emotions of the average man, however inflamed, could withstand.

[W]ould [you] consider as a matter—consider in mitigation, no matter what the other evidence would show, whether he would consider as a mitigating factor evidence of sympathy for the Defendant.

No matter what the evidence would show, whether or not the juror would consider as a mitigating factor the education and social background of the Defendant.

[W]hether or not the juror would consider as a mitigating factor, no matter what the other evidence would show, the immaturity and sophistication of the Defendant.

The court ruled that the form of these questions were "an attempt to bind" the venireperson and were not permitted, as phrased. Appellant sought to ask these same questions of other venirepersons and received a running objection to the court's refusal.

During appellant's voir dire of venireperson Crow he asked the following question:

If you were called upon as a juror and you were now in the punishment phase of the trial, I will ask you if you could consid-

er evidence of temporary insanity caused by voluntary intoxication in mitigation of the penalty attached to the criminal offense?

The trial court sustained the State's objection to this question. Appellant contends that the trial court's restriction of voir dire prevented him from intelligently exercising his peremptory challenges.

In *Trevino v. State*, 815 S.W.2d 592 (Tex. Crim.App.1991), *reversed on other grounds*, 503 U.S. 562, 112 S.Ct. 1547, 118 L.Ed.2d 193 (1992), the defendant complained the trial court erred in restricting his attempts during voir dire to ask venirepersons whether they would consider the defendant's youthfulness in mitigation of punishment. In holding that the trial court did not abuse its discretion, we explained:

> The appellant either asked open ended questions ("would you consider evidence of the youthful age of any criminal defendant") or questions where in he attempted to bind the prospective jurors as to whether they would mitigate punishment due to the age of the offender ("In dealing with the death penalty ..., could you consider as mitigation or in lessening the punishment the youthful age of a person convicted of capital murder").... Our reading of the record indicates that in all three complained of instances the defense asked questions in hopes of binding the particular juror to a particular course of action without explaining to them what was required under the law.

*Id.* at 599.

We likewise hold the trial court in the instant case did not abuse its discretion in ruling that the form of appellant's questions was improper. Modifying each question by asking, "no matter what the other evidence showed" could be construed as an attempt to bind the venireperson to say that they would view the specified evidence "in mitigation" or "as a mitigating factor" under *any* circumstances, which would therefore include the circumstances involved in the instant case. *See Trevino*, supra; *cf. Johnson v. State*, 773 S.W.2d 322, 330 (Tex.Crim.App.1989)(trial court did not abuse discretion in overruling challenge for cause on ground that juror

would not give particular variety of 'mitigating evidence' consideration), *aff'd* 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993). Appellant was not prevented from rephrasing the questions. In fact, the trial court stated that the questions could be phrased as "could you consider [the specified evidence] in deciding punishment," but could not be phrased as to whether the evidence could be considered "in mitigation." The trial court did not abuse its discretion in ruling that the form of the questions was improper. **Points of error eighteen, nineteen and twenty are overruled.**

█ In his twenty-first point of error appellant claims the trial court erred in overruling his challenge for cause against venireperson James Chandler Pollard because he testified that he would not consider appellant's age in his consideration of the special issues.

During voir dire appellant asked venireperson Pollard whether the youthfulness of the defendant "would have any bearing on how [he] might answer" the special issues. Pollard responded that it would not. Appellant contends that Pollard's refusal to consider youth at punishment rendered him challengeable for cause. We disagree.

We have held that a juror is not subject to a challenge for cause "where it is shown that a juror will or may not give a particular variety of 'mitigating evidence' any consideration." A juror may give any weight or no weight to particular evidence in determining the special issues. All that the constitution requires is that he not be precluded from considering evidence offered in mitigation and that he be provided a vehicle to give effect to such evidence:

> The United States Supreme Court has not yet mandated that jurors *must* give any amount of weight to any particular piece of evidence that might be offered in mitigation of punishment. *Cordova*, 733 S.W.2d at 189. What the Court has decided is that the factfinder must not be precluded or prohibited from considering any relevant evidence offered in mitigation of the punishment to be assessed, or in answering the punishment question. [citations

omitted] What this means is that the fact-finder must be allowed to hear the evidence and act upon it. . . . Once [mitigating evidence is] admitted, the jury may then give it weight, if in their individual minds it is appropriate, when answering the questions which determine sentence. *Johnson*, 773 S.W.2d at 330–31. Accordingly, the fact that Pollard would give no weight to age in considering punishment does not subject him to a challenge for cause. **Point of error twenty-one is overruled.**

 In point of error twenty-two appellant claims the trial court erred by failing to instruct the jury that a failure to agree on its answers to the special issues was an option, as well as answering "yes" or "no".

We have held that it is not error for a trial court to fail to instruct the jury of the effect of their failure to agree on the special issues. *Robertson v. State*, 871 S.W.2d 701 (Tex. Crim.App.1993), *cert. denied* —— U.S. ——, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994). In *Robertson*, we rejected the defendant's complaint that the trial court erred in refusing to submit a jury form providing that the jury could respond, "yes", "no" or "we can't decide" in answering the special issues. We said:

It is the role of a juror simply to answer the special issues either "yes" or "no," and nothing else. Conversely, it is not the role of the individual juror to skirt this responsibility by failing to return a vote. The issues are framed in a manner which permits them to be answered either affirmatively or negatively, and it is the purpose of the deliberative process to resolve juror vacillation.

*Id.* at 709–10 (quoting *Nobles v. State*, 843 S.W.2d 503, 510 (Tex.Crim.App.1992)). In light of the fact that a jury functions to resolve the factual issues and reach a verdict, the trial court did not abuse its discretion in failing to inform the jury that it is an option for them to fail to agree in answering the special issues. *See Robertson*, supra. **Point of error twenty-two is overruled.**

 In his twenty-third point of error appellant claims the trial court erred in denying his challenge for cause against venireper-

son Robert Lynch on the ground that he could not distinguish between the terms "intentionally" and "deliberately." Appellant concedes that Lynch testified that he *could* make a distinction, but argues that Lynch's testimony as a whole reveals that he could not distinguish between the terms and therefore would automatically answer the first special issue "yes" once intentional conduct had been found.

Initially Lynch testified that he had difficulty understanding the difference between the two terms. Eventually, though, he agreed that he did see a distinction and that he would not automatically answer the first issue in the affirmative. At the end of his voir dire, the trial court specifically questioned Lynch in this regard:

[The court]: One other thing I have got a little unclear in my mind before I let the lawyers decide whether they want to accept you or excuse you as a juror in this case.

Have you now come to some degree of differentiation between the word intentionally, as used in the guilt-innocence stage of the trial, and the word deliberately, as used in the punishment stage of trial?

[Lynch]: Well, I am not so sure that my definition is the same as yours, but I have distinguished the two words in my own mind.

[The court]: You do have a distinguishing factor between the two—whether it's the same as mine or not is unimportant, I think.

[Lynch]: Yes.

The trial court overruled appellant's challenge based upon Lynch's "responses as a whole."

In reviewing rulings on challenges for cause, we afford great deference to the trial court who had the opportunity to view the venireperson and assess their demeanor and other factors that cannot be taken into account on the basis of a cold record. When the venireperson equivocates or vacillates, we defer to the trial court's ruling. Although Lynch expressed initial confusion over the terms, he eventually testified that he understood a distinction between them. On this

record, we hold the trial court did not abuse its discretion in overruling appellant's challenge for cause. **Point of error twenty-three is overruled.**

In point of error twenty-eight appellant claims Tex. Code Crim. Proc. Ann. art. 37.071 "is unconstitutional because it fails to provide any mechanism by which the jurors could give recognition to the balance between the aggravating and mitigating factors involved in this case." Appellant argues that the Supreme Court's decision in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), which upheld article 37.071 as constitutional, "is wrong." The State correctly points out that this issue was

recently examined in *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) where the Supreme Court continued to uphold the Texas statute and its decision in *Jurek*.[24] While the mitigating factor at issue in *Franklin* was the petitioner's good prison record, we are not convinced that the mitigating evidence in this case compels a different result. Appellant does not persuade us otherwise. **Point of error twenty-eight is overruled.**

The State's motion for rehearing is sustained. The judgment of the trial court is affirmed.

CLINTON, J., dissents.

---

24. In *Franklin*, the petitioner claimed, among other things, that under article 37.071 the jury was "not permitted to weigh petitioner's mitigating evidence apart from its deliberation over the Texas Special Issues, and return a verdict requiring a life sentence." *Franklin*, 487 U.S. at 172, 108 S.Ct. at 2326. The petitioner contended that the special issues should provide a "mechanism though which to impose a life sentence" even if the jury otherwise believed the special issues should be answered "yes." *Id.* at 177, 108 S.Ct. at 2329.

APPENDIX

MANSFIELD, Judge, concurring.

I join the well-written opinion of the majority and write separately to respond to Judge Baird's dissenting opinion.

Over five years elapsed from the time this cause was formally submitted and argued to the date on which this Court delivered its per curiam opinion. A badly fractured Court affirmed appellant's conviction but reformed his sentence from death to life imprisonment in an unpublished opinion. *Soria v. State,* (Tex.Crim.App. No. 69,679, delivered June 8, 1994). The Court, in effect, found the evidence insufficient to support the jury's affirmative answer as to the future dangerousness special issue.

On March 29, 1995 we granted the State's motion for rehearing and ordered the case resubmitted on May 10, 1995 without oral argument. The State contended, in its brief on rehearing, that we failed to review the evidence as to the future dangerousness special issue in the light most favorable to the verdict, as required by *Jackson v. State,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and its progeny, e.g., *Wright v. West,* 505 U.S. 277, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992), and also required by precedent from this Court. *See Wilkerson v. State,* 881 S.W.2d 321, 324 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994); *Hughes v. State.,* 878 S.W.2d 142 (Tex.Crim.App.1992); *Burns v. State,* 761 S.W.2d 353, 356 (Tex.Crim.App. 1988); *Chambers v. State,* 903 S.W.2d 21 (Tex.Crim.App.1995); *Joiner v. State,* 825 S.W.2d 701, 703 (Tex.Crim.App.1992).

At trial, the following evidence of future dangerousness was offered by the State:

(1) testimony that appellant had planned the murder in a methodical and calculated manner over a several week period, in order to steal the victim's vehicle and convert it to cash;

(2) testimony by a police officer as to appellant's bad reputation in the community as a non-law abiding and violent person;

(3) evidence of appellant's assault on another inmate while in prison and discovery of a razor in his cell;

(4) a self-portrait of appellant, interpreted by a psychiatrist for the State as evidence that appellant saw himself as an angry and violent individual. The psychiatrist testified that it was his opinion, based on his review of the case and in response to a hypothetical question, appellant would commit criminal acts of violence that would constitute a continuing threat to society; and

(5) evidence that appellant had participated, two months prior to the murder, in an unsuccessful attempt to burglarize a church.

In *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim.App.1987), we adopted a list of factors we would consider in considering an appellant's claim the evidence is insufficient to support the jury's affirmative answer to the "future dangerousness" special issue:

(1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;

(2) the calculated nature of the defendant's acts;

(3) the forethought and deliberateness exhibited by the crime's execution;

(4) the existence of a prior criminal record, and the severity of the prior crimes;

(5) the defendant's age and personal circumstances at the time of the offense;

(6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

(7) psychiatric evidence; and

(8) character evidence.

There is little question, based on the record, this was a deliberate and planned crime committed by appellant for pecuniary gain. He abducted the complainant at gunpoint, forced him to drive to a remote area, and then killed him by stabbing him twice in the back of the head or neck. He had expressed his intent to kill the complainant on several occasions to acquaintances prior to doing so. Factors (2) and (3) of *Keeton* are therefore present. *See also, Flores v. State,* 871 S.W.2d 714 (Tex.Crim.App.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 313, 130 L.Ed.2d 276 (1994).

The circumstances of the offense show a deliberate, brutal taking of a life by appellant that required close contact with the complainant, and action, i.e., use of a knife, showing a wanton and callous disregard for life. Additionally, appellant enlisted the assistance of others and directed their activities so as to facilitate commission of this offense. Factor (1) of *Keeton* is present. *See also, Dinkins v. State*, 894 S.W.2d 330, 358 (Tex.Crim. App.), *cert. denied,* —— U.S. ——, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995); *Martinez v. State*, 924 S.W.2d 693 (Tex.Crim.App.1996) (circumstances of the offense alone may be sufficient to support an affirmative finding as to the future dangerousness special issue).

There is psychiatric testimony in the record that appellant is likely to commit future acts of violence as well as testimony as to appellant's bad character. This evidence meets Factors (7) and (8) of *Keeton.* The record is devoid of evidence appellant was under duress or was acting at the direction of another at the time of the offense; this lack of evidence therefore meets Factor (6) of *Keeton.*

Other than an arrest for attempting to break into a church and damaging an expensive stained glass window, appellant had no formal criminal record, though there was some testimony he had committed several minor nonviolent offenses. Appellant's prior criminal record, in and of itself, would not support an affirmative answer as to the future dangerousness special issue; therefore, Factor (4) of *Keeton* is not met.

Appellant was young, eighteen, at the time of the offense. However, the record does not demonstrate he was mentally handicapped, under the influence of drugs or otherwise laboring under circumstances that would tend to militate against a finding of future dangerousness. Though arguably, Factor (5) of *Keeton* is met.

In summary, the evidence of future dangerousness in the present case, analyzed by use of the eight factors set forth in *Keeton,* is strong and approaches being overwhelming. The majority, in my opinion, carefully analyzes the evidence and appropriately defers to the rational finding of the jury that appellant will likely commit future acts of criminal violence so as to constitute a continuing threat to society.

Judge Baird's dissent, in my opinion, interprets *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976), incorrectly, insofar as he implies *Jurek* requires this Court to ignore *Jackson v. Virginia* and sit, in effect, as a thirteenth juror with respect to the punishment special issues in capital cases. Our opinions in this case, both on original submission and on resubmission, demonstrate the meaningful appellate review required by the Eighth Amendment and *Jurek;* both are characterized by cogent analysis and reasoning, taking into account applicable constitutional, statutory and case law. The fact that we now reach a different result is not evidence of a lack of integrity, response to political pressure, or a disregard of our oath of office. I state confidently that the members of this Court do not base their opinions on political considerations but base them instead on their interpretations of the law which, by the very fact there are nine of us, will often differ. Is that not the reason what we write are called *opinions?*

With these comments I join the opinion of the Court.

BAIRD, Judge, dissenting.

This case has a checkered history that must be recounted in order to put this dissent into proper perspective. Appellant was convicted of capital murder and sentenced to death. The trial court's judgment was entered July 8, 1986. This case was orally argued and formally submitted to this Court on February 22, 1989. However, the case was not resolved until five years later when this Court, in a per curiam opinion delivered June 8, 1994, affirmed appellant's conviction but reformed the sentence from death to confinement for life. *Soria v. State* (Tex.Cr. App. No. 69,679, delivered June 8, 1994) (not published). Our decision was far from unanimous. Judges Clinton, Maloney and Meyers concurred with the per curiam opinion. Judge Overstreet and I dissented to the affirmance of the conviction but concurred with the reformation. And, Judges McCormick, Miller, Campbell and White concurred in the

affirmance of the conviction but dissented to the reformation.

Our decision to reform appellant's sentence was not popular and we received a great deal of criticism from the print media and the citizenry of this State. Thereafter, the State filed its motion for rehearing on June 21, 1994. Today, more than two years later the Court reverses itself and reinstates appellant's death sentence.

This Court has direct appellate jurisdiction of all capital cases where the death penalty is imposed. Tex. Const., art. V, § 5. The citizenry vested this Court with that authority because a statewide appellate court was thought to be more insulated from unpopular decisions than the various courts of appeals. This insulation was designed to promote the evenhanded and consistent imposition of capital punishment. Indeed, in *Jurek v. Texas* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976), the United States Supreme Court, in holding our capital sentencing scheme constitutional, stated:

> . . . [b]y providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law.

In light of the foregoing history, it is clear that this Court has failed to provide prompt judicial review of this case. And, in reversing our position on original submission, it is equally clear that this Court is not operating in a manner which promotes the evenhanded, rational and consistent imposition of capital punishment. This case makes it abundantly clear that this Court has abandoned any pretense of providing the meaningful appellate review required by the Eighth Amendment. *Martinez v. State*, 924 S.W.2d 693, 699 (Tex.Cr.App.1996) (Baird, J., dissenting); *and, Morris v. State*, —— S.W.2d ——, ——, 1996 WL 514833 (Tex.Cr.App. No. 71,799, delivered this day) (Baird, J., dissenting).

Canon 3(B)(2) of the Code of Judicial Conduct provides that judges shall not be swayed by partisan interest, public clamor or fear of criticism. I am not at all confident that the instant majority opinion (and the decision to publish it) meets the commands of that can-on. The facts the majority relies upon today to reverse itself have been known to this Court for many years and were pointed out by Judge Campbell in his dissent on original submission.

Because the parties who have cases before us and the citizenry of this State deserve better, I dissent.

OVERSTREET, J., joins this opinion.

OVERSTREET, Judge, dissenting.

In appellant's second point of error, appellant claims that the trial court erred in sanctioning appellant by limiting the proposed testimony of defense, expert witness Dr. Griffith, because of appellant's refusal to comply with the trial court's order to be examined by the State's psychiatrist, Dr. Coons. The majority holds that when a defendant, after being examined by a psychiatrist, presents psychiatric testimony on the question of future dangerousness, the trial court has the power to compel the defendant to an examination of an expert of the State's or court's choosing. Because I maintain that the trial court does not have the authority to compel psychiatric examinations on the issue of future dangerousness, and that testimony by appellant's expert does not constitute a waiver of a defendant's Fifth Amendment privilege, I must dissent.

During the punishment phase of the trial, Dr. Grigson, a psychiatrist, testified as an expert witness for the defense. Dr. Grigson, having examined appellant thoroughly, testified that it was his opinion that appellant would not constitute a future danger. At the conclusion of Dr. Grigson's testimony, the State requested the court to allow the State the opportunity to have one of their experts examine appellant. The State argued that appellant had waived his Fifth Amendment privilege against self-incrimination by offering Dr. Grigson's testimony, and therefore the State should be allowed to have appellant examined by one of their experts. Over appellant's objections, the trial court agreed with the State, and orally ordered appellant to submit to a psychiatric interview by the State's psychiatrist.

Appellant refused to cooperate with the State's psychiatrist, Dr. Coons, and consequently, at trial, Dr. Coons could only testify based on a hypothetical. The trial court held that because of appellant's failure to follow it's order to be interviewed, that as a sanction, appellant's second expert, Dr. Griffith, would be limited to testifying based upon a hypothetical. As a result of the court's ruling, appellant decided not to call Dr. Griffith, but preserved error by making a bill of exception.

The majority holds that appellant waived his Fifth Amendment privilege against self-incrimination when Dr. Grigson testified that appellant would not be a future danger. The majority also holds that the trial judge had the authority to order an examination as to future dangerousness. Neither the Supreme Court, nor this Court have held that a defendant waive his Fifth Amendment privilege against self-incrimination when he admits psychiatric testimony to show that he will not be a danger in the future. Furthermore, neither the Supreme Court nor this Court have held that a trial judge has the authority to compel a defendant to be interviewed by the State's psychiatrist on the issue of future dangerousness. In *Bradford v. State*, 873 S.W.2d 15 (Tex.Cr.App.1993) (plurality op.), this Court held that "a trial court does not have the authority to appoint a psychiatrist for the purpose of examining a defendant for evidence relating solely to his future dangerousness, and that doing so was error". See also *Bennett v. State*, 742 S.W.2d 664, 671 (Tex.Cr.App.1987), and *McKay v. State*, 707 S.W.2d 23, 38 (Tex.Cr.App.1985).

The majority chooses not to follow this line of cases. Instead, they dismiss *Bradford*, and proceed to announce a new rule that allows compelled examination of a defendant by a State expert on the issue of future dangerousness. They simply expand the rule that gives judges permission to require psychiatric examination of defendant's on the issues of sanity and competency because a defendant has made them issues, and extend the issue of future dangerousness. Compelled psychiatric examination is clearly distinguishable from required examination for incompetency or insanity. By allowing trial judge to order capital defendant's to be examined by the State's expert simply because he has offered testimony that he will not be a danger in the future is forcing appellant to choose between two independent rights. Appellant has the right to introduce mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Appellant also has the right to not incriminate himself. The assertion of one of these rights should not negate the other.

It cannot be said that it is necessary for an appellant to be forced into submitting to an examination by the State's psychiatrist, who will undoubtedly testify that appellant poses a danger in the future. Even though a judge should not be permitted to order a defendant to such an examination, this does not mean that the State has no means of convincing the jury that the death penalty is the appropriate punishment for the defendant. Psychiatric testimony based on first hand observation is surely not the only way to rebut appellant's assertion that he would not be a future danger. The State has the opportunity to cross examine appellant's psychiatrist to discredit or create doubt in the juror's minds of his opinions. And, the State also has the right to introduce the testimonial opinions of their own experts, based on detailed hypotheticals, as is often done. Additionally, there is no requirement that the State offer any psychiatric testimony at all to prove future dangerousness. For example, we have held that there are numerous factors a jury can consider in deciding future dangerousness, and in fact, "the circumstances of the offense alone, if severe enough can sustain an affirmative answer to special issue two against a sufficiency challenge." *Vuong v. State*, 830 S.W.2d 929 (Tex.Cr.App.1992).

In the case at bar, several factors must be considered. First of all, it is important to note that the request by the State to have their doctor examine appellant came very late in the proceedings. In fact, this did not occur until the punishment phase, after the State's case in chief, and after appellant had begun putting on his defense. Also, it should be troublesome to the Court that the order

by the trial judge was not put in writing. Furthermore, the State did cross examine appellant's psychiatrist, and introduced the expert opinion of their own doctor. Most importantly, it is inconsistent with the fair administration of justice for a trial judge to require a capital defendant to choose between his right to introduce mitigating factors, and his right against self incrimination. To put it simply, it is inconceivable that we would create a new law that gives judges the power to require capital defendants to be interviewed by the State's psychiatric expert, for the purpose of providing the State with information that will be used in an attempt to put the defendant to death, and it is incredulous that this Court would agree with a sanction that punishes a defendant for failing to follow an order that the trial court had no authority to impose in the first place. For these reasons, I respectfully dissent.

BAIRD, J., joins.