**Opinion filed January 11, 2024**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00010-CR

_____

## FABIAN CHAVEZ POLVON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 161st District Court**
**Ector County, Texas**
**Trial Court Cause No. B-20-0175-CR**

### O P I N I O N

The jury convicted Appellant, Fabian Chavez Polvon, of capital murder. Because the State did not seek the death penalty, the trial court assessed his punishment at confinement for life, without the possibility of parole, in the Correctional Institutions Division of the Texas Department of Criminal Justice. *See* TEX. PENAL CODE ANN. § 12.31(a)(2) (West 2019), § 19.03(a)(7)(A) (West Supp. 2023). In his sole issue on appeal, Appellant contends that the trial court erred when

it "fail[ed] to limit the timing, method, and scope" of the mental health examination that it ordered the State's expert to complete. We affirm.

## Background Facts

On November 26, 2019, Appellant's estranged wife, Tiffany Polvon, had parked her vehicle in the parking lot of a car wash. She and a male passenger, Joseph Granado, were sitting inside the vehicle when Appellant drove his pickup into the parking lot and rammed it into the back of Tiffany's vehicle. Appellant exited his pickup armed with a gun. Granado, a manager at the car wash, was occupying the front passenger seat of Tiffany's vehicle at the time. Granado exited the vehicle as Appellant approached. As Appellant approached, he shot Granado twice, hitting him once in the face and once in the chest, mortally wounding him. Appellant then circled around the front of Tiffany's vehicle and moved to the driver's side where he shot Tiffany at least eight times in the face, head, neck, and torso, before dragging her body from the vehicle and leaving it laying on the ground. Both Tiffany and Granado died at the scene.

Tiffany had previously filed for divorce in February 2019. A close family member of Tiffany testified that Appellant threatened Tiffany that "if he ever caught her in [her] vehicle with another man, that she wasn't going to like what would happen" and to "be careful what you do and where you go, because I have eyes everywhere." In October 2019, the same family member was with Tiffany at a bar when Appellant entered the bar with three male family members and started a scuffle with two men that had been playing "Jenga" with the women.

## Procedural History

Appellant timely filed a notice of his intent to present the affirmative defense of insanity. *See* PENAL § 8.01 (West 2021); TEX. CODE CRIM. PROC. ANN. art. 46C.051 (West 2016). Appellant's attorneys informed the State that they had retained Dr. James Schutte, a forensic psychologist, to interview Appellant. The

2

State subsequently filed a motion requesting that Appellant submit to an interview by the State's psychiatric expert in order to prepare for possible rebuttal testimony.

At the pretrial hearing on the State's motion, defense counsel objected to the State's motion to appoint a psychiatric expert. Defense counsel argued that, under *Soria v. State* and *Lagrone v. State*, "the notice of insanity is a very limited waiver of the Defendant's 5th Amendment right. Because that [sic] 5th Amendment waiver, the State is . . . very circumscribed as to what they can do, and is only limited only [sic] to rebuttal and only to what we have done." *See Soria v. State*, 933 S.W.2d 46, 57–58 (Tex. Crim. App. 1996); *Lagrone v. State*, 942 S.W.2d 602, 611 (Tex. Crim. App. 1997) (holding that trial courts are allowed to "order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, *or plans to introduce*, its own future dangerousness expert testimony.") (emphasis in original).

Defense counsel first asserted that this "limited waiver" of Appellant's Fifth Amendment rights required the trial court to appoint a psychologist, rather than a psychiatrist, because defense counsel had retained a psychologist. The trial court disagreed that the language of *Soria* and *Lagrone* requires trial courts to appoint the same type of expert used by the defense. Defense counsel also asserted that the State's expert was required to use the same examination methods in the same manner as the defense expert had conducted his examination. Following a discussion between the trial court and counsel, the trial court determined that it would be "fundamentally unfair" to require the State's expert to evaluate Appellant with "their hands tied."

The trial court ruled that (1) the State's expert could "use medically recognized manners of investigation" to determine Appellant's sanity at the time of the offense; (2) defense counsel and the State should exchange expert reports prior to trial; and (3) defense counsel should object to the State expert's report before the

State expert testifies if defense counsel determined the report went "way too far" or "violate[d] *Lagrone*."

At the conclusion of the pretrial hearing, the trial court revisited its ruling on the State's motion. The following exchange occurred between the trial court and the attorneys:

> THE COURT: [T]he order is that the State's psychiatrist can be [sic] examine using all medical -- medically reasonable techniques. However, the Defense, obviously, upon review of the State's Expert's report. If they see something that they think has gone, in their opinion too far, they will bring it to the court's attention and I recall on it. But as far as getting there, the State's expert can use all reasonable medical techniques to do the examination for sanity at the time of the alleged offense?
>
> [THE STATE]: Yes, sir.
>
> THE COURT: Is that clear enough for everybody?
>
> [THE STATE]: Yes, sir.
>
> [DEFENSE COUNSEL]: Yes. Thank you very much.
>
> THE COURT: All right. And, then again, if you have a problem with what he brings back and you notify me, we will take it up before it goes to the jury, even if we just need a 5 minute hearing.

The trial court also signed a written order granting the State's motion. It provided that Appellant would be interviewed by the State's mental health expert, Dr. Roddy Strobel, M.D.

The State subsequently filed a motion to exclude defense expert testimony on the issue of insanity after Appellant "refused to cooperate" with Dr. Strobel during her examination. In Appellant's response to the State's motion, defense counsel explained that they had spoken with Appellant after the State informed them of

4

Appellant's refusal to cooperate and that "there was a misunderstanding and that [Appellant] intended to cooperate with the State's expert."

The trial court held another pretrial hearing after being informed that Dr. Strobel had concerns about Appellant's competency to stand trial. At the hearing, Dr. Strobel recounted that she had started her evaluation by asking Appellant what "not guilty by reason of insanity" meant, and Appellant told her that "he wasn't sure." Dr. Strobel felt that she "needed to decide for [her]self if the Defendant was competent to stand trial" before she continued with the sanity evaluation.[1] Dr. Strobel continued to ask Appellant competency questions. Appellant answered some questions, but not others, and Dr. Strobel decided to stop the examination. The trial court asked defense counsel whether he was concerned with Appellant's competency to stand trial, and defense counsel confirmed that he had no concerns. The trial court proceeded to conduct its own inquiry of Appellant's competency. Satisfied with Appellant's answers, the trial court ordered that Dr. Strobel re-examine Appellant as soon as possible and that Appellant cooperate with the examination. Dr. Strobel was able to complete her evaluation about a week later.

At trial, defense counsel called their expert, Dr. Schutte, to testify during Appellant's case-in-chief. Dr. Schutte testified that he interviewed Appellant four times for a total of ten hours and that, in his professional opinion, Appellant was legally insane at the time of the offense. Dr. Schutte diagnosed Appellant with "major depressive disorder, severe, with psychotic features." Dr. Schutte testified that Appellant's disorder had caused him to suffer from hallucinations and delusions at the time of the offense that made him unable to understand that his conduct was wrong or illegal.

---

[1]Dr. Strobel explained that it is best practice to begin a sanity evaluation with competency questions because "someone has to be competent in order to be evaluated for sanity."

Dr. Schutte testified that Appellant gave a history of "episodes of hearing the voice of his step-father mumbling at him, swearing at him. And he also reports having seen or experienced what is a visual hallucination of his step-father." Appellant informed Dr. Schutte that he had taken an acne medication listing hallucinations and delusions as potential side effects. Appellant's family told Dr. Schutte that Appellant had "a history of concussions" and had experienced at least three traumatic brain injuries in his lifetime.

Appellant told Dr. Schutte that, on the day of the offense, he "was surprised to see his step-father" at the car wash. Appellant told Dr. Schutte that his stepfather approached his vehicle and swore at him. Appellant believed that his wife had become "involved" with his stepfather and that he had to shoot his stepfather to save his wife from a "dangerous relationship."

Dr. Schutte opined that Appellant was exhibiting signs of a severe mental illness at the time of the shooting. Dr. Schutte explained that, when a person experiences delusions and hallucinations like Appellant said he experienced at the car wash, it "can lead them to not appreciate that what they are doing is wrong or illegal, because they are operating on something going on internally, rather than what is going on objectively or externally." Dr. Schutte stated that he was "always sensitive to the possibility that the person may not be forthcoming with [him]" when examining a patient for a court setting, but that he did not believe Appellant was malingering during the interviews.

The State then called Dr. Strobel to testify as a rebuttal witness. We note that, irrespective of the trial court's statement that it would permit the defense to challenge Dr. Strobel's assessment if it felt that Dr. Strobel went too far in her examination of Appellant, Appellant did not present a complaint about Dr. Strobel's examination prior to her testimony at trial. Further, the defense did not lodge an objection to Dr. Strobel's testimony. Dr. Strobel interviewed Appellant twice for a total of four

6

hours. Dr. Strobel disagreed with Dr. Schutte's diagnosis of Appellant as having major depressive order, severe, with psychosis.

Dr. Strobel testified that she was unable to complete a sanity evaluation during her first visit with Appellant because "[he] did not answer, or at the time, chose not to or could not answer . . . questions regarding competency to stand trial," causing concerns about Appellant's competency. Appellant gave Dr. Strobel some "background history" during her first visit, such as "see[ing] a man with a baseball cap hovering over his bed when he was six," seeing a marriage counselor, previously being on an antidepressant, and seeking mental health services while he was incarcerated. Dr. Strobel perceived Appellant exhibiting signs of "mild paranoia" and noted that he did not always make eye contact with her. Dr. Strobel said that a lack of eye contact can indicate "avoiding" when Appellant was "talking about things that may not have been true."

Dr. Strobel recalled Appellant being "more forthcoming" during her second visit. Strobel said that Appellant gave her more information about the day of the incident, maintained better eye contact, and was "able to answer the competency restoration questions that he couldn't answer . . . eight days before." Dr. Strobel testified that Appellant's different behavior during her second visit would "indicate that at least at one point he was not telling the truth[.]"

Dr. Strobel testified about the inconsistencies between what Dr. Schutte reported that Appellant told him during his interviews and what Appellant told Dr. Strobel during her interviews. Dr. Strobel testified that Appellant was inconsistent in what type of alcohol he had consumed on the day of the shooting, his motivations in disposing of the firearm he used, and, notably, what he perceived at the time of the shooting. Appellant told Dr. Schutte that he saw his stepfather on the day of the shooting, but he told Dr. Strobel that the passenger in his wife's vehicle "looked a lot like his step-father. Even his voice sounded like his step-father's."

7

Dr. Strobel noted that Appellant's act of shooting his wife more times than the male passenger was significant because, if Appellant had hallucinated that the passenger was his stepfather, the passenger "would be the person, logically, that would receive the rage end, more bullets." Dr. Strobel also noted that she believed Appellant was being dishonest with her when Appellant told her that he did not remember shooting the male passenger, yet also said he remembered feeling "shaky" after he shot him.

Dr. Strobel further testified that delusions are not "one time affairs" and that it would be "highly unlikely that in a split minute you would have a delusion." Thus, Dr. Strobel's opinion was that Appellant was sane at the time of the offense and that he was able to understand the difference between right and wrong. Dr. Strobel believed Appellant was malingering during his interviews.[2]

The trial court's charge contained an instruction that "no act done in a state of insanity can be punished as an offense" and that the defendant must prove that, "at the time of the conduct charged against a person, as a result of severe mental disease or defect, he did not know that his conduct was wrong" by a preponderance of the evidence. The jury rejected Appellant's claim of insanity by finding him guilty of capital murder.

*Analysis*

In his sole issue, Appellant contends that the trial court's failure to place limits on Dr. Strobel's examination resulted in a violation of Appellant's Fifth Amendment privilege against self-incrimination. Appellant asserts that the trial court allowed the State, through Dr. Strobel, to have "an unfettered opportunity" to custodially interrogate Appellant "for the purpose of finding inconsistencies in his statements."

---

[2]Dr. Strobel defined malingering as "an intentional production of false or exaggerated symptoms of either physical or psychological matter. And it is produced to get some kind of external reward to get out of something or to gain something."

The State contends that Appellant failed to preserve his complaints for our review because he did not object to Dr. Strobel's report or testimony.

We begin with the threshold issue of whether Appellant preserved his complaints for appellate review. "As a prerequisite to presenting a complaint for appellate review," a party must have made a timely request, objection, or motion to the trial court "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). The trial court must then either "(A) rule[ ] on the request, objection, or motion, either expressly or implicitly; or (B) refuse[ ] to rule on the request, objection, or motion, and the complaining party objected to the refusal." TEX. R. APP. P. 33.1(a)(2).

Appellant states his issue as follows: "Whether the trial court erred in failing to limit the timing, method, and scope of the State's mental health evaluation of Appellant." He contends that the State's expert psychiatrist was able to interrogate him without the protection of the assistance of counsel or a recording device that would have accurately recorded Appellant's statements. Appellant asserts that the trial court gave Dr. Strobel "an unfettered opportunity to interrogate [Appellant] without his attorney, for the purpose of finding inconsistencies in his statements." Appellant further contends that the trial court "made no effort to limit the State's expert's interrogation, nor the introduction of statements obtained during that interrogation."

"Generally, a party must complain in the trial court in order to preserve that complaint for appellate review." *London v. State*, 490 S.W.3d 503, 506–07 (Tex. Crim. App. 2016) (citing TEX. R. APP. P. 33.1(a)(1)). "Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009). As explained by the court in *Pena*:

> To avoid forfeiting a complaint on appeal, the party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." This gives the trial judge and the opposing party an opportunity to correct the error.

*Id.* (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).

Some of Appellant's contentions on appeal do not comport with the matters that he raised in the trial court. Appellant did not make a request to the trial court for his trial counsel to be present for Dr. Strobel's examination or that it be recorded. By failing to make these specific requests with respect to the procedures for Dr. Strobel's examination, Appellant did not preserve these complaints for appellate review. *See Davis v. State*, 313 S.W.3d 317, 351 (Tex. Crim. App. 2010) (addressing objections to the procedure for a mental health examination). Appellant also waived any objection to the matters to which Dr. Strobel testified by not objecting at trial. "It is now axiomatic that in order to preserve an error in the admission of evidence for appellate review, a defendant must make a timely objection." *Johnson v. State*, 878 S.W.2d 164, 167 (Tex. Crim. App. 1994).

At the pretrial hearing, Appellant objected to the State's motion to appoint a psychiatric expert and asserted that the language in the motion was "overbroad." Appellant asked the trial court to impose limits on Dr. Strobel's examination in order to protect his Fifth Amendment privilege against self-incrimination. Appellant asserted to the trial court that the State should only be able to use a psychologist to examine him using "the exact same testing and exact same methods that we did." Appellant also asserted that the State's examination should be rebuttal in the sense that Dr. Strobel should not be able to examine Appellant until Dr. Schutte submitted his report. Thus, Appellant objected in the trial court to the type of expert that the State could use, the nature of the examination that the State's expert could do, and the timing of the examination by the State's expert. The trial court overruled each

10

of these objections. Accordingly, Appellant preserved these complaints for appellate review. *See* TEX. R. APP. P. 33.1(a)(1)(A).

Because Appellant's preserved complaints implicate a constitutional privilege against self-incrimination, we review the trial court's rulings de novo. *Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011). In many respects, Appellant's preserved complaints concern the rule announced in *Lagrone* and *Soria* and the scope of the examination that they require. As explained in *Chamberlain v. State*:

> The holdings of *Soria* and *Lagrone* are governed by the principle that if a defendant breaks his silence to speak to his own psychiatric expert and introduces that testimony which is based on such interview, he has constructively taken the stand and waived his fifth amendment right to refuse to submit to the State's psychiatric experts. The focus is the defendant's choice to break his silence. The issue is not whether appellant introduced psychiatric evidence or merely rebutted such evidence. The issue is whether the psychiatric testimony he intended to introduce was based on his own participation in the psychiatric testing and examination. Appellant intended to introduce psychiatric testimony based upon his participation in a psychiatric examination. This "constitute[s] a waiver of the defendant's fifth amendment privilege in the same manner as would the defendant's election to testify at trial." *Soria*, 933 S.W.2d at 54. Appellant cannot claim a fifth amendment privilege in refusing to submit to the State's psychiatric examinations and then introduce evidence gained through his participation in his own psychiatric examination. The essential principles at work in *Lagrone* and *Soria* are waiver and parity; if a defendant testifies, even in mere rebuttal, the State may be allowed to cross-examine him. *Lagrone*, 942 S.W.2d at 611; *Soria*, 933 S.W.2d at 54.

998 S.W.2d 230, 234 (Tex. Crim. App. 1999); *see Davis*, 313 S.W.3d at 352 (explaining the underlying rationale for the *Lagrone* rule.)

Appellant initially suggests that the *Soria-Lagrone* rule may not apply to non-death penalty cases. In a mandamus proceeding, the El Paso Court of Appeals noted that the Texas Court of Criminal Appeals has not extended the *Soria-Lagrone* rule

to non-death penalty cases. *In re State*, 588 S.W.3d 307, 310 (Tex. App.—El Paso 2019) (orig. proceeding). In another mandamus proceeding, the Texas Court of Criminal Appeals noted that the applicability of the *Soria-Lagrone* rule to non-death penalty cases was unsettled. *Simon v. Levario,* 306 S.W.3d 318, 322 (Tex. Crim. App. 2009) (orig. proceeding).

The Fort Worth Court of Appeals addressed the *Soria-Lagrone* rule in a non-death penalty case in *Lott v. State*, No. 02-18-00487-CR, 2019 WL 5792660, at *11 (Tex. App.—Fort Worth 2019, pet. ref'd) (mem. op., not designated for publication). Like Appellant here, the defendant in *Lott* filed a notice stating his intent to present an insanity defense. *Id.* at *9. The court concluded that a defendant's future dangerousness in a death penalty case, as was the issue in *Soria* and *Lagrone*, is analogous to a claim of insanity in any context. *Id.* at *11. The court held:

> We fail to see why the court of criminal appeals' holdings in *Soria* and *Lagrone* would not apply here. And the federal courts have uniformly held that where a defendant raises a mental-status defense such as insanity during the guilt-innocence phase of trial, the constitution does not prohibit a trial court from ordering the defendant to undergo a psychiatric examination for the limited purpose of rebutting the asserted defense. *See United States v. Byers*, 740 F.2d 1104, 1111 (D.C. Cir. 1984) (plurality opinion) (collecting cases); *U.S. v. Cohen*, 530 F.2d 43, 47 (5th Cir. 1976) (holding "compelled psychiatric examination [may be ordered] when a defendant has raised the insanity defense"); *see also Kansas v. Cheever*, 571 U.S. 87, 94 (2013) ("[W]here a defense expert who has examined the defendant testifies that the defendant lacked the requisite mental state to commit an offense, the prosecution may present psychiatric evidence in rebuttal.").

> Here, the trial court ordered Lott to submit to a psychiatric examination with Price only after Lott filed notice that he intended to raise insanity. Given that fact, and based on the above authorities, we conclude that the trial court did not violate Lott's Fifth Amendment privilege against self-incrimination by ordering him to submit to that examination to rebut Lott's insanity defense.

*Id.* at *11-12. For the same reasons expressed in *Lott*, we also conclude that the *Soria-Lagrone* rule applies whenever a defendant intends to present an insanity defense in a non-death penalty case. The rationale is the same—"if a defendant breaks his silence to speak to his own psychiatric expert and introduces that testimony which is based on such interview, he has constructively taken the stand and waived his fifth amendment right to refuse to submit to the State's psychiatric experts." *Davis*, 313 S.W.3d at 352.

The holdings of *Soria* and *Lagrone* provide that a trial court should limit a compelled psychiatric examination to rebuttal issues. *See Soria*, 933 S.W.2d at 57–58; *Lagrone*, 942 S.W.2d at 611–12. Neither case prescribes the specific methods the State's expert should use in conducting an examination of a defendant to ensure that the expert's examination is limited to rebuttal. *Soria* and *Lagrone* also do not specify that the State must use the same type of mental health expert used by the defense. Furthermore, the requirement for a defendant to submit to a mental health examination by the State's expert is triggered when the defense "introduces, *or plans to introduce*" its own expert testimony. *Lagrone*, 942 S.W.2d at 611 (emphasis in original). Accordingly, Appellant is incorrect in his assertion that Dr. Strobel had to have Dr. Schutte's report in hand before examining Appellant.

Appellant contends that the trial court should have imposed limits on Dr. Strobel's examination to protect Appellant's Fifth Amendment privilege against self-incrimination. But as noted by the court in *Lott*, when the State's expert is tasked with determining the defendant's sanity at the time of the offense, "[s]uch a determination necessarily would require [the State's expert] to question [the defendant] about the surrounding circumstances of the offense." 2019 WL 5792660, at *10 (citing *U.S. v. Leonard*, 609 F.2d 1163, 1165 (5th Cir. 1980) ("[P]sychiatrists would not be able to obtain reliable testimony [on the issue of sanity] unless they

were free to inquire into the prior conduct of the defendant, including his participation in the criminal activity with which he is charged.").

Appellant also contends that Dr. Strobel was acting as an "agent for the State" because she was testifying as "an interrogator who successfully tricked her subject into apparently contradicting himself."[3] The record does not support this contention. Dr. Strobel testified that she arrived at a malingering diagnosis because Appellant provided inconsistent details between his interview with Dr. Schutte and his interview with Dr. Strobel. Dr. Strobel testified that being dishonest can be a sign of malingering, and that Appellant giving different information to her than he gave to Dr. Schutte led to her malingering diagnosis. Therefore, Dr. Strobel was not testifying about Appellant's inconsistent statements during her examination to impeach Appellant's credibility, but rather to support her opinion regarding Appellant's sanity and malingering diagnosis. Furthermore, as noted in *Leonard*, the defendant's privilege against self-incrimination is protected whenever he submits to an examination by the State's mental health expert on the issue of sanity because the matters that the defendant discloses to the State's expert cannot be used to address any other issues. 609 F.2d at 1166.

In summary, Appellant gave notice of presenting an insanity defense and he spoke to his own mental health expert to support his claim. By doing so, Appellant waived his Fifth Amendment privilege against self-incrimination under *Soria* and *Lagrone* for the purpose of rebutting the asserted insanity defense. An examination by the State's mental health expert under *Soria* and *Lagrone* is not limited by the type of expert that the State may use, the type of examination that the State's expert may employ, or the sequence of the examination performed by the State's expert. Because Appellant sought to present an insanity defense, the waiver of his privilege

---

[3]Once again, we note that Appellant did not lodge any objections to Dr. Strobel's testimony at trial.

14

against self-incrimination necessarily extended to an inquiry by the State's mental health expert into details about the charged conduct. Thus, the trial court did not err or violate Appellant's Fifth Amendment privilege against self-incrimination by ordering him to submit to Dr. Strobel's examination to rebut Appellant's insanity defense. We overrule Appellant's sole issue on appeal.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


January 11, 2024

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.